

SEALED

BY ORDER OF THE COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | MAG. NO. 18 - 0 1 1 4 2 KSC |
| | ) | |
| Plaintiff, | ) | CRIMINAL COMPLAINT |
| | ) | |
| VS. | ) | |
| | ) | |
| ERNEST BADE, (1) | ) | |
| YVONNE CAITANO, (2) | ) | |
| Sheena STRONG, (3) | ) | |
| Marie BENEVIDES, (4) | ) | |
| Theresa SALTUS, (5) | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 1 5 2018

at 2 o'clock and 55 min. P M
SUE BEITIA, CLERK

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Beginning at a date unknown, but by at least May 2015 and continuing until at least October 2018, Ernest BADE, Yvonne CAITANO, Sheena STRONG, Marie BENEVIDES, and Theresa SALTUS did knowingly and intentionally, combine, conspire, confederate and agree with each other, and with others known and unknown, to distribute and possess, with intent to distribute, Schedule II, III, IV, and V controlled substances in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C) and 846.

//

//

//

//

//

//

//

I further state that I am a Task Force Officer with the Drug Enforcement Administration and that this Complaint is based upon the facts set forth in the attached "Affidavit in Support of Criminal Complaint", which is incorporated herein by reference.

Sworn to before me and
subscribed in my presence,
this **15** day of October
2018, at Honolulu, Hawaii.

Craig Okano
Task Force Officer, DEA

HON. RICHARD L. PUGLISI
United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, CRAIG S. OKANO, after being duly sworn, deposes and states as follows:

1.    This affidavit is made in support of a criminal complaint charging Ernest BADE, Yvonne CAITANO, Sheena STRONG, Marie BENEVIES, Theresa SALTUS with violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846 knowingly and intentionally conspiring with others, known and unknown, to distribute and possess with intent to distribute Schedule II, III, IV and V controlled substances.

I.    **Affiant's Training and Experience**

2.    I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and have been assigned to the DEA since September 2014. I am currently assigned to the DEA Honolulu District Office Tactical Diversion Squad ("TDS").   I have received specialized training from the DEA to include the Tactical Diversion Squad course, the Basic Narcotics Investigator course, Money Laundering and the JETWAY Interdiction course. These trainings focused on methods of unlawful drug trafficking; the identification of controlled

substances; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and, the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations.

3.     I have been a sworn law enforcement officer since 1997. I have worked as a United States Air Force Security Forces police officer and a Parole and Probation Officer for the State of Nevada Department of Public Safety. I am currently a Deputy Sheriff for the State of Hawaii Department of Public Safety and have been since 2001. As a law enforcement officer, I have been trained in narcotics identification, detection and investigation. I have been involved in over 100 narcotics arrests derived during traffic stops or personal encounters. These encounters have involved illicit drugs such as crystal methamphetamine, heroin, marijuana, cocaine as well as pharmaceutical controlled substances. As a DEA TFO, I have participated in numerous investigations where I have: (a) conducted physical and wire surveillance; (b) executed search warrants; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers and money launderers; (d) debriefed cooperating drug traffickers and money launderers; (e)

4

monitored wiretapped conversations of drug traffickers; and (f)
conducted surveillance of individuals engaged in drug
trafficking, money laundering, and other violations of federal
law. Through my training, education, and experience, as well as
the experience and knowledge of my fellow law enforcement
officers, I have become familiar with: (a) the manner in which
illegal drugs are imported and distributed; (b) the method of
payment for such drugs; and (c) the efforts of persons involved
in such activity to avoid detection by law enforcement.

## II. Overview of the Law and Policy Regarding Prescription Medications

4.    Based on my training and experience, and discussions
with other experienced agents I know that the legal distribution
of controlled substances must meet certain federal rules and
regulations. Specifically, I know the following:

> a. Title 21 U.S.C. § 812 establishes schedules for
> controlled substances which present a potential for
> abuse and the likelihood that abuse of the drug could
> lead to physical or psychological dependence.  Such
> controlled substances are listed in Schedule I through
> Schedule V depending on the level of potential for
> abuse, the current medical use, and the level of
> possible physical dependence. Controlled Substance
> Pharmaceuticals are listed as controlled substances,

from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction. There are other drugs that are available only by prescription but are not classified as controlled substances. Title 21 of the Code of Federal Regulations, Part 1308, provides further listings of scheduled drugs.

b. Pursuant to Title 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed, or distributed by persons who are registered to do so with the Attorney General of the United States (with some exceptions, such as delivery persons). The Attorney General has delegated authority to register persons to the DEA.

c. 21 C.F.R. § 1306.04 sets forth the requirements for a valid prescription. It provides that for a "prescription for a controlled substance to be effective [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding

responsibility rests with the pharmacist who fills the prescription." (Emphasis added)

d. 21 C.F.R. § 1306.05 sets forth the manner of issuance of prescriptions. It states that "All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address, and registration number of the practitioner." (Emphasis added)

e. 21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law. Distribution of a scheduled controlled substance in violation of 21 U.S.C. § 841(a)(1) (often referred to as "diversion") by a medical doctor occurs when a medical doctor knowingly and intentionally prescribes a controlled substance, knowing the drugs were controlled, for a purpose other than a legitimate medical purpose and outside of "the usual course of professional practice." *See United States v. Moore*, 423 U.S. 122, 124 (1975) ("We . . . hold that registered physicians can be prosecuted under 21 U.S.C. § 841 when their activities fall

outside the usual course of professional practice.");
*see also United States v. Feingold*, 454 F.3d 1001,
1008 (9th Cir. 2006) ("[T]o convict a practitioner
under § 841(a), the government must prove (1) that the
practitioner distributed controlled substances, (2)
that the distribution of those controlled substances
was outside the usual course of professional practice
and without a legitimate medical purpose, and (3) that
the practitioner acted with intent to distribute the
drugs and with intent to distribute them outside the
course of professional practice.").

## III. The Controlled Substances in this Investigation

5.    The controlled substances in this investigation
include, the following:

    a. Hydrocodone - a generic name for a narcotic analgesic
that in its pure form is classified under federal law
as a Schedule II, however it is sold in combination
forms (Vicodin, Norco, Lortab, etc.) that are
classified as Schedule III controlled substances.
Hydrocodone, when legally prescribed for a legitimate
medical purpose, is typically used for the relief of
mild to moderate pain. Accordingly, the prescription
is generally for a modest number of pills to be taken
within a short period of time. Hydrocodone typically
has a street value of $6 to $7 per tablet.

    b. Oxycodone - a generic name for a narcotic used to
treat moderate to severe pain. It is marketed either

alone as controlled release (OxyContin) and immediate release formulations (OxyIR, OxyFast), or in combination with other nonnarcotic analgesics such as aspirin (Percodan) or acetaminophen (Percocet). Oxycodone is classified as a Schedule II controlled substance. Oxycodone-containing products are in tablet, capsule, and liquid forms. The main sources of oxycodone on the street have been through forged prescriptions, professional diversion through pharmacists, doctors, armed robberies and nursing homes. According to reports from DEA field offices, oxycodone products sell at an average of $1 per milligram, the 40 mg OxyContin tablet being the most popular.

c. Fentanyl - a generic name for a potent synthetic opioid that treats chronic severe pain. When legally prescribed, fentanyl is also used for anesthesia and comes in a form of a transdermal patch or an injection. Fentanyl is classified as Schedule II controlled substance. Fentanyl was introduced into medical practice as an intravenous anesthetic under the trade name of Sublimaze in the 1960s. Other brand names are Actiq, Duragesic and Fentora. Fentanyl is about 100 times more potent than morphine as an analgesic. Fentanyl sometimes is used illegally as a recreational drug mixed with heroin and cocaine. Fentanyl is abused for its intense euphoric effects. Fentanyl patches are abused by removing the gel contents from the patches and then injecting or injecting these contents. Patches have also been frozen, cut into pieces and placed under the tongue or

in the cheek cavity for drug absorption through the oral mucosa. Used patches are attractive to abusers as a large percentage of fentanyl remains in these patches even after a 3-day use.

d. Morphine – a generic name for a narcotic that treats moderate to severe pain. Morphine acts directly on the central nervous system to decrease the feeling of pain. Morphine is federally classified as Schedule II controlled substance. Morphine is sold under the brand names of MScontin, Oramorph and Sevredol. The street value of morphine is $7-$15 per pill.

e. Testosterone – a generic name for an anabolic steroid that is used to treat condition caused by a lack of a naturally occurring sex hormone that is produced in a man's testicles. Testosterone comes in a form of an injection and is classified as Schedule III controlled substance. Testosterone injection is used in men and boys to treat conditions caused by lack of this hormone, such as delayed puberty, impotence, or other hormonal imbalances. The brand names for testosterone are Aveed, Delatestryl, Depo-Testosterone, Testosterone Cypionate and Testosterone Enanthate. Testosterone has a street value of $150-$200 for 10 cc. vial.

f. Alprazolam – a generic name for a sedative that is classified as Schedule IV controlled substance. When legally prescribed, alprazolam treats anxiety and panic disorders. Alprazolam is a benzodiazepine. The brand names for alprazolam include Niravam, Xanax and Xanax XR. The street value of alprazolam is $4-$6 per pill.

g. Temazepam – is a generic name for a benzodiazepine classified as Schedule IV controlled substance. Temazepam is a sedative and treats insomnia. Temazepam goes by its brand name Restoril.

h. Clonazepam – is a generic name for a benzodiazepine classified as Schedule IV controlled substance. Clonazepam is a sedative and treats seizures, panic disorders and anxiety. The brand name for clonazepam is Klonopin.

i. Carisoprodol – a generic name for a muscle relaxant that is classified as Schedule IV controlled substance. Carisoprodol goes by a brand name – Soma. When legally prescribed, carisoprodol treats pain and stiffness from muscle spasms. The street value for carisoprodol is $1-$5 per pill.

j. Zolpidem – is a generic name that is typically sold under the brand name Ambien. It is a sedative primarily used for the treatment of insomnia. Zolpidem is classified as a Schedule IV controlled substance. The street value of Ambien is $2-$6 per pill.

k. Lyrica – is a brand name for a nerve pain medication. The generic name for Lyrica is pregabalin. Lyrica can treat nerve and muscle pain, including fibromyalgia. It can also treat seizures. Lyrica is classified as Schedule V controlled substance. Illicitly, Lyrica is used as a recreational drug to achieve euphoria. Lyrica is one of the frequent potentiates prescribed with opiates.

l. Promethazine-codeine syrup, Robitussin with codeine and Guaifenesin-codeine syrup – cough preparations containing not more than 200 milligrams of codeine per

100 milliliters. Cough syrups containing codeine are classified as Schedule V controlled substances. One of the ways that people use codeine syrups is by mixing them into alcoholic beverages or nonalcoholic sodas, creating an intoxicating mix nicknamed "lean," "purple drank," "syrup" and "sizzurp."

## IV. Probable Cause

6. This affidavit is intended only to establish that there is sufficient probable cause to conclude that the defendants referenced above committed the aforementioned offense. This affidavit does not set forth all of my knowledge about this matter.

### A. *Overview of Investigation*

7. Through review of public records and the undercover investigation described below, this affiant has learned the following: Dr. Ernest BADE ("BADE") is a medical doctor who operates the "Bade Medical Clinic", in Hilo, Hawaii. BADE is registered with the DEA under registration number AB8243278. DEA TDS began investigating the Bade Medical Clinic in 2014. Yvonne CAITANO ("CAITANO") works as an office assistant at Bade Medical Clinic, and has been so employed since at least 2015. Sheena STRONG ("STRONG") works as an office assistant at the Bade Medical Clinic, and has been so employed since at least 2015. STRONG is believed to be the daughter of CAITANO. Marie BENEVIDES ("BENEVIDES") works as an office assistant at the Bade

Medical Clinic, and has been so employed since at least 2018. BENEVIDES is believed to be the mother of CAITANO. Theresa SALTUS ("SALTUS") works as an office assistant at the Bade Medical Clinic, and has been so employed since at least 2018. CAITANO, STRONG, BENEVIDES, and SALTUS are also all patients of BADE.

8. On July 28, 2014, DEA Diversion Investigators interviewed a pharmacist in Hilo, HI ("Pharmacist 1") regarding his experience with BADE. Pharmacist 1 reported that he and other pharmacists with whom he has spoken have frequently received prescriptions authorized by BADE for high quantities of controlled substances, and in particular, opioids such as methadone, oxycodone, and morphine, which appeared to be outside the normal course of professional practice. Pharmacist 1 reported that BADE's prescriptions are flagged in Walmart's internal database system for several reasons: (1) BADE writes prescriptions for schedule II controlled substances in high quantities; (2) BADE frequently prescribes opioids in conjunction with benzodiazepines and muscle relaxants[1]; and (3)

---

[1] According to my training and experience, the combination of an opioid, a benzodiazepine, and a muscle relaxant is referred to as the "holy trinity", and is highly sought-after by individuals seeking to divert pharmaceutical drugs to the black market. This combination is typically avoided by legitimate medical doctors because these medications combine to create an increased risk of overdose.

when Pharmacist 1 would often try to contact BADE to verify prescriptions, BADE was typically inaccessible.

9.    On July 28, 2014, DEA Diversion Investigators interviewed a second pharmacist in Hilo, Hawaii (Pharmacist 2), regarding the prescribing history of BADE. Pharmacist 2 stated in substance that BADE was reputed to seeing patients at unusual hours up to 2:00am.  Pharmacist 2 stated that BADE never answered the telephone when she tried to verify a prescription. However, from time to time, BADE would call regarding medication that no one has used in approximately 20 years. Furthermore, Pharmacist 2 stated that BADE writes prescriptions for unusually large quantities of controlled substances. For example, he generally writes prescription for hydrocodone in amount of 360 dosage units.  Pharmacist 2 stated that she will not fill a prescription for any more than 240 dosage units and will not fill a prescription for schedule II controlled substances written by BADE.

B. Undercover Investigation

10.    Based in part on the preceding information, in May 2015, the DEA began an undercover investigation of BADE and the Bade Medical Clinic.

11.    On May 27, 2015, at approximately 12:11 p.m., a DEA officer, acting in an undercover capacity (hereafter, the "UC") entered BADE's office for an initial appointment, complaining of

14

"stiffness" to his shoulder. After approximately four and a half hours of waiting, CAITANO informed the UC that she and the other office staff would be leaving for the day, and instructed the UC to lock the door. CAITANO also instructed the UC to sit next to the door behind the wall so that if someone was to look through the door, the office would appear to be empty. The UC locked the door as instructed and took a seat behind the wall.

12. At approximately 7:00 p.m. (seven hours after the UC arrived), BADE called the UC into his office. Upon entering BADE's office, the UC observed that his office was extremely cluttered. The examination table contained stacks of patient medical records in disarray, there were also dog food bowls and dog training pads in the corner, and BADE had his two (2) dogs in the examination office with him.

13. The UC informed BADE that he was seeking treatment for shoulder stiffness for about two months, and that he did not have medical coverage. The UC informed BADE that he was initially taking Motrin for the pain, and that his friend gave him some "oxys" (street slang for oxycodone) at night when he couldn't sleep. Although BADE took a personal and medical history and conducted a range of motion check, BADE did not order any imaging studies such as an x-ray or MRI, did not discuss a pain management contract, and did not conduct a drug screen. At the conclusion of the visit, the UC observed BADE

generate, sign, and give to the UC two (2) prescriptions. The
first prescription was for thirty (30) 30mg Extended Release MS
Contin[2] pills. The second prescription was for thirty (30) 350mg
Carisoprodol pills.

14. BADE stated that if it did work out, he had the UC
marked down for a prescription pick up. BADE stated that the
night before, he prepares the refill prescriptions for pick up
and they have them ready. BADE stated that the UC would only
have to come in and get his blood pressure checked and then go.
BADE stated that he would not have to see the UC again
unless it was not working out. In that case, the UC would have
to schedule an appointment. The UC confirmed with BADE that his
next appointment would be June 26, 2015 unless it was not
working out then the UC would then schedule an appointment in
June to discuss alternative medications or dosages.

15. The UC asked BADE if he would like the UC to pay him
now and BADE stated that he would get an invoice and it would be
best for the UC to pay him now. The UC then followed BADE out
into the reception area. BADE asked the UC if he spoke with
CAITANO about the charges. The UC stated that CAITANO told him
it would be $120.00. BADE told the UC that the first
appointment would be $75.00. The UC paid BADE $75.00 in

---

[2] MS Contin is a brand name for morphine sulfate, a schedule II
controlled substance.

official advance funds (OAF) for the office visit. BADE wrote
out the UC a receipt for payment. The UC asked BADE if the
follow up appointment would be $75.00 also. BADE informed the
UC that the follow up would be approximately $50.00, $75.00
if BADE was seen again.

16. On June 26, 2015, at approximately 8:57 a.m., the UC
and a second DEA undercover officer acting in an undercover
capacity (hereafter, "UC2") entered the Bade Medical Clinic to
pick up a refill prescription for the UC and to schedule an
appointment for UC2 for the purpose of obtaining a prescription
for oxycodone. The UC and UC2 left Bade Medical Clinic because
the prescription was not ready, and returned at approximately
11:30 a.m. At approximately 2:00 p.m., the UC began a
conversation with CAITANO regarding a patient who had appeared
upset. CAITANO told the UC that the patient failed his random
urinalysis because of the temperature. CAITANO stated that when
BADE tested the sample for body temperature it was lower then
what was allowed. CAITANO stated that he was given the
urinalysis because he made a scene at the pharmacy and the
pharmacy requested the urinalysis. CAITANO stated that the
funny thing is that BADE does not send the samples to be tested
for illegal drugs and that the patient "screwed himself" by
trying to cheat. The UC asked CAITANO if the samples ever get
to be tested. CAITANO stated no, and that BADE just checks them

to ensure they are at body temperature when the sample is obtained.

17.   While in the office, the UC and UC2 observed CAITANO issue numerous prescriptions to various patients.  The UC and UC2 observed the patients walk-in and speak to CAITANO. CAITANO then would walk into the first door on the left (vitals room) and open a drawer in the desk.  CAITANO then flipped through a stack of prescriptions, removing the prescriptions pertaining to the patient and hand them to the waiting patient. Upon receiving their prescription, the patients departed the office with the prescriptions in hand.  At no time did the UC and UC2 observe these "refill" patients speak or see BADE.

18.   At approximately 2:40 p.m., CAITANO walked out from BADE's office and handed the UC a prescription for 30 30mg MS Contin pills.  At approximately 2:54 p.m., the UC and UC2 exited BADE's office.  The UC was not examined nor was his vitals taken during the visit.  The UC did not see BADE.  The UC also did not have to pay for the prescription.

19.   On July 24, 2015, the UC returned to the Bade Medical Clinic to pick up a refill prescription for MS Contin.  Upon entry, the UC was notified by CAITANO that they would be collecting a urine sample from everyone today.  CAITANO stated that they were required to turn in a minimum amount of urine a week and they did not have enough, and that everyone would have

to provide a sample. The UC informed CAITANO that he was going to get some water. CAITANO handed the UC a prescription for thirty (30) 30mg Extended Release MS Contin pills. The UC subsequently departed BADE's office and returned to the neutral location. The UC purchased a small bottle of Chinese green tea and mixed it with 1 part purified water to provide a fake urine sample. The UC warmed the fake urine in a microwave and filled a ziplock bag with the fake urine. The UC then returned to BADE's office with the fake urine sample. Upon entering the office, the UC informed CAITANO that he was ready to provide a urine sample. The UC obtained the collection cup bearing his UC name and entered the restroom where he poured the fake urine into the cup. The UC was then instructed by CAITANO to put the cup containing the fake urine sample onto the file cabinet in the patient file room. The UC then scheduled his next appointment with STRONG. The UC paid twenty (20) dollars cash for his appointment.

20. Due to the investigative needs of other cases, the undercover investigation was temporarily suspended and resumed in June 2018.

21. On June 20, 2018, at approximately 11:51 am, the UC entered BADE's for an undercover appointment with BADE and to acquire prescriptions for controlled substances.

22. Upon entering the office, the UC observed a female, later identified as SALTUS, standing at the door of the reception area. The UC was greeted by CAITANO who told SALTUS to "do his vitals." Prior to June 20, 2018, the UC had contacted the Bade Medical Clinic and requested a copy of his medical file. He was informed at that time that his file could not be located. The UC again asked SALTUS and CAITANO if she found the UC's chart. CAITANO stated that they never found his chart. CAITANO asked the UC if the office had ever sent the chart to the UC. The UC stated "no", and asked CAITANO if she could just make him one and they could write whatever they wanted in the chart. CAITANO asked SALTUS to have the UC fill out the new form. CAITANO asked the UC if he had anything wrong with him and the UC stated "no." CAITANO instructed SALTUS to fill in as much information as possible regarding pain, history, diabetes, blood pressure in the UC's chart when she does his vitals. The UC informed SALTUS that she can put whatever she wants in his file. CAITANO asked UC if he used to have back pain. The UC stated "shoulder". CAITANO asked the UC which one, and the UC stated left shoulder stiffness. CAITANO then asked the UC if he was on any medication and UC informed CAITANO that he was buying it from people because he was unable to obtain medication from a Maui doctor. The UC informed CAITANO that this was the reason why he was trying to

transfer his file. The UC informed CAITANO that the doctors on Maui are strict and they require the medical files even if the UC informed them that he was seeing BADE for his medication. The UC then followed SALTUS into the exam room where she took his blood pressure, weight, and asked about his concerns. SALTUS stated that she needs to write what the UC's concerns are. The UC stated it is primarily the shoulder stiffness but if SALTUS needs to write something for the doctor she can write whatever she wants because they lost the UC's patient file. SALTUS then asked the UC if he had his flu shot and the UC stated "yes." SALTUS asked the UC if he had lab work done and the UC stated "yes" about a year and a half ago, SALTUS asked the UC if he had done x-rays and the UC stated "no", SALTUS then asked the UC "hospital?" and the UC stated "no", SALTUS then asked the UC if he had depression and the UC stated "when he got to pay taxes", SALTUS stated "ok, I'll write that he will laugh." SALTUS continued and asked if the UC is a "smoker?", and the UC stated "no." SALTUS asked the UC "ok, left shoulder stiffness, does it keep you up at night?" The UC stated "no, just like um, more like moving around, and getting up in the morning." SALTUS asked the UC "so moving is harder?" The UC stated "yeah, just like with everyday, you know when you get up its stiff." SALTUS asked the UC if it burns and the UC responded "no." SALTUS asked the UC if there was anything else?

The UC responded "no, that's pretty much what I saw him for the last time." SALTUS asked the UC if he does physical therapy and the UC told SALTUS "no." SALTUS asked the UC "So moving is harder in the morning. Does it get better?" The UC responded "yeah, I guess after I start moving around." SALTUS then wrote on the UC patient file that moving is harder in morning. SALTUS stated to the UC "I don't know what else to put, Yvonne can fill in the blanks." The UC stated "yeah she can put whatever she like." The UC and SALTUS then left the vitals room and returned to the reception area.

23. While at the reception area the UC and CAITANO made small talk about the volcano activity and SALTUS asked the UC how long he was in Hilo for. The UC stated that he was there till Friday. CAITANO informed the UC that she goes to Maui once a month and that CAITANO can drop off the UC's prescription to him at the airport. CAITANO stated that the doctor just has to see the UC once every 6 months. The UC asked CAITANO what she does on Maui. CAITANO stated that they have a business on Maui doing repossessions. CAITANO informed the UC that she flies once a month to pick up the paperwork. CAITANO also stated that she can even mail the UC his scheduled prescriptions. CAITANO then stated that she had to take her uncle to the store. The UC asked CAITANO if he should just hang out till the doctor is ready and CAITANO stated yes.

24. While the UC waited for his appointment, the UC spoke with an elderly female later identified as BENEVIDES. BENEVIDES stated that she helps around the office because she does not want to stay home.

25. At approximately 2:10 pm, CAITANO stated that she was leaving for the day. The UC asked CAITANO for her phone number to arrange a meet to drop off the UC's prescription as discussed earlier. CAITANO handed the UC her phone number (808-989-9270) written on a piece of paper.

26. At approximately 2:17 pm the UC was called in the exam room by BADE. Upon taking a seat BADE asked the UC "whats happening with your shoulder?" The UC informed BADE that it was the same thing he saw the UC for a while ago, "just stiffness." The UC informed BADE that he had previously prescribed the UC oxycodone. BADE looked at the file provided to him by CAITANO and advised the UC "I can't find your records, but that doesn't mean we can't treat you." BADE asked the UC how he hurt his shoulder. The UC explained to BADE that he hurt his shoulder riding his motorcycle. BADE then asked the UC how many pills he had prescribed him in the past. The UC informed BADE that initially he took 2 pills a day, once in the morning and once in the evening. The UC also informed BADE that on the

next appointment BADE increased the dosage to 3 times a day.[3]
BADE then asked the UC "was that muscle relaxant much help?" The
UC replied "not really."

27. BADE asked the UC "was it hydrocodone or was it
morphine?" The UC informed BADE that he knew it was not
hydrocodone and that the UC may be confused between oxycodone
and MS Contin (morphine). The UC observed on the screen that
the prescription was only for one tablet a day, and not three
tablets as discussed. The UC informed BADE of the discrepancy
and observed BADE change the prescription to ninety pills of
30mg MS Contin (morphine). BADE then printed the prescription
and handed it to the UC.

28. The UC then asked BADE, "you know of any better
relaxant other than the carisoprodol that might be better?" The
UC then observed BADE look through a drop down list of
medication on the screen. After a short search BADE informed the
UC that he "can't locate it right now." The UC then asked BADE
"should we just try the carisoprodol again, you
think?" BADE replied "huh" and the UC repeated "you think we
should just try the carisoprodol again?" The UC then observed
BADE select 350mg carisoprodol from the drop down list on his

---

[3] Neither of these statements were true. In 2015, the UC was
prescribed MS Contin and carisprodol, each once per day. The UC
stated that BADE had increased it to ninety pills per month
(three per day) to test whether BADE would fill the increased
prescription.

computer. Upon BADE selecting carisoprodol the UC observed what appeared to be a drug interaction warning pop up on his screen. The UC observed BADE cancel the warning and create a prescription for thirty pills of 350mg carisoprodol and handed it to the UC.

29. The UC asked BADE for something to help with his anxiety and BADE responded, "I'm not here to just to prescribe controlled drugs, that seems like that's all you have on your mind right now." The UC told BADE "no, I mean this what you used to give me before, exactly." BADE then told the UC "well that's all I'm going to give right now" and the UC responded "ok". Shortly thereafter the UC exited BADE's office.

30. On July 30, 2018, at approximately 1239 hours, the UC, placed a consensually recorded phone call to the Bade Medical Clinic. SALTUS answered the phone. The UC asked SALTUS if Yvonne was there (referring to CAITANO). SALTUS then asked who is calling. The UC gave his undercover alias and SALTUS told the UC to hold on. While on hold, the UC could overhear SALTUS talking to CAITANO. CAITANO told SALTUS to ask the UC when his prescription was due. The UC informed SALTUS that his prescription (MS Contin 30mg and Carisoprodol 350mg) was due last week. The UC overheard SALTUS talking to CAITANO, informing CAITANO "it was due already, like last week". CAITANO then stated "oh, we was on vacation, tell him I going

make um tomorrow and mail um to him". SALTUS then relayed the message to the UC stating that CAITANO will mail him his prescription.

31. On August 6, 2018, DEA Special Agent Eric Klapheimer received the prescription addressed to the UC at the Kihei Post Office. The prescription was for ninety 30 mg MS Contin and was signed by BADE.

32. Based on your affiant's experience and training in pharmaceutical diversion investigations, the observations of the UC contained several "red flags" which support the conclusion that BADE prescribed controlled substances outside the course of professional practice with no legitimate medical purpose. These red flags include (without limitation) the following observations: (i) that BADE operated his clinic outside normal business hours, and that the UC frequently waited multiple hours to see BADE; (ii) the condition of BADE's office was cluttered and unsanitary, and not consistent with a typical doctor's office; (iii) the UC observed multiple individuals come in and receive prescriptions directly from office staff without being seen by BADE, (iv) CAITANO's information that BADE did not actually perform urinalysis on any patients, (v) BADE prescribed the UC a powerful opioid without conducting urinalysis, discussing a pain management contract, requiring imaging studies such as x-rays or MRIs, (vi) BADE prescribed the UC an opioid in

conjunction with a muscle relaxant, which are a combination that has increased risk for overdose, (vii) BADE did not require the UC to be examined prior to his June 2015 and July 2015 refills, (viii) the Bade Medical Clinic could not locate the UC's medical chart when requested, (ix) BADE increased the UC's prescription from one pill per day of MS Contin to three pills per day just because the UC asked for the increase, and (x) BADE's staff mailed the UC's next prescription to Maui without requiring the UC to come in for a medical exam.

   C. *The Maui Diversion Scheme*

   33.   On June 6, 2018, at approximately 3:10 pm, investigators from the DEA Honolulu District Office interviewed a pharmacist ("Pharmacist 3") in Kahului, Hawaii.  Investigators asked Pharmacist 3 if there were any patients filling there that resided off island.  Pharmacist 3 identified SALTUS, CAITANO, and STRONG as patients of BADE who filled prescriptions at a particular pharmacy ("Pharmacy 1") in Kahului, Hawaii as well as a few others that Pharmacist 3 believed to be related to SALTUS, STRONG, and CAITANO.

   34.   DEA has received controlled substance release signature logs from Pharmacy 1 indicating that CAITANO and SALTUS picked up prescriptions from Pharmacy 1 for multiple individuals.  Pharmacist 3 stated that he had tried to call BADE multiple times to verify prescriptions before filling them, but

that he has never actually spoke with BADE. Pharmacist 3 stated that every time he called, an office assistant would answer the phone and verify the prescription. When Pharmacist 3 asked for BADE, the office assistant stated that BADE was with a patient and was not available at the time.

35. Based on the information providing by Pharmacist 3, DEA investigators obtained flight records from Hawaiian Airlines for CAITANO, STRONG, BENEVIDES, and SALTUS for flights between Hilo and Kahului for January 2017 through October 2018. DEA investigators similarly obtained prescription records from the State of Hawaii Prescription Drug Monitoring Program ("PDMP") for the same time period. By comparing these records, investigators identified a pattern. For each of the months for which records were obtained, one or more of CAITANO, STRONG, BENEVIDES, and SALTUS would fly from Hilo to Kahului. That person or persons would then go to one or both of two pharmacies in Maui – Pharmacy 1 in Kahului and a second pharmacy ("Pharmacy 2") in Makawao, Hawaii. That person or persons would then fill prescriptions, each signed by BADE, for multiple individuals (many of whom are believed to be members of CAITANO/STRONG/BENEVIDES's family), frequently filling prescriptions for the same individual at both pharmacies. These prescriptions typically involve high quantities of controlled substances, including opioids such as oxycodone, morphine,

fentanyl, and hydrocodone, as well as carisoprodol (schedule IV) and Lyrica (schedule V). That person or persons would then return to Hilo, frequently on the same day.

36. According to PDMP records, since September 2016, CAITANO, STRONG, BENEVIDES, and SALTUS have collectively filled controlled substances in the following total amounts:

| DRUG TYPE | SCHEDULE | QUANTITY |
|---|---|---|
| Oxycodone HCL 30 mg | II | 10,682 |
| Oxycodone HCL 15 mg | II | 1,890 |
| Oxycodone APAP 10 mg/325mg | II | 9,960 |
| Hydrocodone APAP 10 mg/325mg | II | 4,680 |
| Fentanyl Patches 75 mcg | II | 115 |
| Morphine Sulfate 15 mg | II | 900 |
| Carisoprodal 350 mg | IV | 2,070 |
| Alprazolam (1 mg or 2 mg) | IV | 1,680 |
| Lyrica 100 mg | V | 360 |
| Zolpidem Tartrate 210 mg | IV | 210 |
| Temazepam 30 mg | IV | 270 |
| Testosterone Cypionate - 10 ml vials | III | 10 |
| Promethazine Codeine - 240 ml | V | 5 |

*D. Interview with SOI*

37. On August 30, 2018, at approximately 2:10pm, DEA Investigators interviewed a Source of Information (hereinafter "SOI") regarding the suspicious drug activities of BADE, CAITANO, STRONG, BENEVIDES, AND SALTUS. SOI is a minor, approximately fourteen years old, who lived with CAITANO as a foster child until approximately February 14, 2018. SOI reported that she was frequently asked to assist CAITANO with

the illegal distribution of pharmaceuticals. She described that CAITANO would go to work at the Bade Medical Clinic, and during work, would call BENEVIDES, CAITANO's mother, to inform her that someone was coming to the house to purchase pills. BENEVIDES would then notify the SOI to get the envelope ready. The SOI stated that he/she was not told the names of who the envelope was for but was only told how many pills to count and to put it in an envelope. When the buyer arrived at the house, the SOI was then asked to run out to the individual waiting in the car and hand over the envelope of pills in exchange for money. The SOI stated that if he/she did not come back with the right amount of money he/she would get verbally or physically abused by STRONG. The SOI stated that STRONG was typically the person that went around collecting money if the amount received was not enough.

38. SOI was asked if he/she knew what kind of pills that he/she was putting into the envelopes. The SOI stated that he/she was never told the names of the pills but that he/she would overhear CAITANO refer to the pills in conversations with BENEVIDES or with STRONG, and recalled her using the names Percocets, Somas or Carisoprodol, and hydrocodone.

39. The SOI stated that CAITANO kept all the pills in a black bag with handles with "Caitano" printed on the bag. The

bag was kept in CAITANO's bedroom under the desk.  The SOI
stated that the bag had numerous bottles of pills with multiple
different patient names on the bottles.  The SOI stated that
he/she was the only person other than CAITANO or STRONG that
would count the pills.

40.  The SOI stated that CAITANO used different names of
individuals on the prescriptions that CAITANO would print out
at BADE's office and have BADE sign them.  The SOI stated that
CAITANO used to fill the prescriptions at pharmacy in Hilo until
they were "cut off."  Once they were cut off in Hilo, CAITANO
started filling the prescriptions with different names at
Pharmacy 2.  The SOI stated that she saw the name of the
pharmacy located on the bottles that were in the bag.  The SOI
stated that every month they would book doctor appointments in
Maui with their medical insurance, fly to Maui, and then cancel
the doctor appointment at the last minute. The SOI stated that
he/she did not know if they knew someone in Maui.  The SOI
stated that they had tried filling the prescriptions in Honolulu
but none of the pharmacies accepted BADE's prescriptions.

41.  The SOI stated that CAITANO would also fill a
container with some blues and whites and would bring the
container with her to work.  The SOI stated that CAITANO and
STRONG only sold the pills but never used the pills themselves
or any of the other individuals in the house.  The SOI stated

that he/she did not believe that any of the individuals in the residence had any legitimate medical issues. The SOI stated that CAITANO also carried a roll of cash on her. The SOI stated that the money they got from selling the pills was used to buy random stuff to store in containers in the garage or pay off credit cards and bills.

42. According to the SOI, the prescriptions were always printed out at the office by CAITANO, presented to BADE, and BADE would sign the prescriptions. The SOI stated that CAITANO was not paid money for working at BADE's office but was paid in prescriptions.

**III. Conclusion**

43. Based on the facts stated above, there is probable cause to believe that BADE, CAITANO, STRONG, BENEVIDES, and SALTUS did knowingly and intentionally, combine, conspire, confederate and agree with each other, and with others known and unknown, to distribute and possess, with intent to distribute, Schedule II - IV controlled substances, in that BADE provided prescriptions for controlled substances to CAITANO, STRONG, BENEVIDES, and SALTUS outside the course of normal professional practice and for no legitimate medical purpose, which then CAITANO, STRONG, BENEVIDES, and SALTUS flew to Maui (to avoid detection) to fill, allowing them to access high quantities of controlled substances to then sell on the illicit drug market.

44. There is also probable cause to believe that BADE wrote prescriptions for high quantities of controlled substances for other patients, including the UC, outside the course of professional practice and for no legitimate medical reason.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Craig Okano
Task Force Officer, DEA

This Criminal Complaint and Affidavit in support thereof were presented to, approved by, and probable cause to believe that defendant above-named committed the charged crime found to exist by the undersigned Judicial Officer at _1435_ _____.m. on October _15_, 2018.

Subscribed and Sworn to Before Me, this _15_ day of October 2018.

_____
HON. RICHARD L. PUGLISI
United States Magistrate Judge